659 F.2d 590
 1981-2 Trade Cases 64,384
 UNITED STATES of America, Plaintiff-Appellant,
v.
Richard BEARDEN, Clarence Stowers, Jr., and Farrell Nixdorf,
Defendants- Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
BROWNING-FERRIS INDUSTRIES OF GEORGIA, INC.; Georgia Waste
Systems, Inc.; SCA Services of Georgia, Inc.; Complete
Refuse Removal, Inc.; James L. Baker; Raymond E. Dinkle;
Charles W. Langello; and Roy P. Fowler, Jr., Defendants- Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
NORTHSIDE REALTY ASSOCIATES, INC.; Barton & Ludwig, Inc.;
Harry Norman & Associates, Inc.; Clover Realty
Co.; Edwin A. Isakson; Chandler B.
Barton; and Harry Norman, Jr.,
Defendants-Appellees.
 No. 81-7285.
 
 JUAN CARLOS
 United States Court of Appeals,
Fifth Circuit.
Unit B*
 Oct. 19, 1981.
 Richard H. Dean, Jr., Janet F. King, Dorothy Kirkley, Asst. U. S. Attys., Carl W. Mullis, John R. Fitzpatrick, Atlanta, Ga., John J. Powers, III, Marion L. Jetton, Washington, D. C., John T. Orr, Jr., Atlanta, Ga., Attys. Antitrust Div., for the U. S.
 Scott McLarty, Decatur, Ga., for Stowers.
 Robert Altman, Mary S. Donovan, Federal Defender Program, Atlanta, Ga., for Bearden.
 John R. Martin, Atlanta, Ga., for Nixdorf.
 John R. Martin and Edward T. M. Garland, Atlanta, Ga., and Joseph V. Giffin, Chicago, Ill., for Georgia Waste Systems.
 Hugh W. Gibert, Halsey G. Knapp, Jr., Atlanta, Ga., for Browning-Ferris Industries of Georgia.
 C. David Vaughan, Atlanta, Ga., for Georgia Waste Systems and Raymond E. Dinkle.
 Hugh Peterson, Jr., Larry D. Thompson, Atlanta, Ga., for SCA Services, Inc.
 Michael A. Doyle, Frank G. Smith, III, Atlanta, Ga., for Complete Refuse Co.
 D. Robert Cumming, Jr., Charles T. Lester, Jr., Atlanta, Ga., for James L. Baker.
 Charles M. Kidd, Woodrow Vaughan, Jr., Atlanta, Ga., for Charles W. Langello.
 Joe H. Bynum, Jr., Atlanta, Ga., for Clover Realty.
 David Kairys, Philadelphia, Pa., for all defendants Northside Realty, et al.
 Michael A. Doyle, Frank G. Smith, III, Atlanta, Ga., for Roy P. Fowler.
 Thomas W. Rhodes, Harold L. Russell, William Maycock, Atlanta, Ga., for Northside Realty.
 Richard D. Elliott, David LaVance, Jr., Atlanta, Ga., for Barton & Ludwig, Inc., and Chandler B. Barton.
 Trammell E. Newton, Trammell E. Vickery, Atlanta, Ga., for Harry Norman & Associates, Inc. and Harry Norman, Jr.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before RONEY, VANCE and RANDALL, Circuit Judges.
 RONEY, Circuit Judge:
 
 
 1
 This case presents an extensive challenge to the selection of grand juries in the Northern District of Georgia. The district court dismissed numerous indictments on the ground the selection process failed to comply with the Jury Selection and Service Act. 510 F.Supp. 668 (N.D.Ga.1981). We reverse, holding that several of defendants' claims were not timely presented and that the remaining claims did not establish substantial violations of the Act. Because constitutional issues raised by defendants were not addressed by the district court, we remand for that purpose.
 
 
 2
 Three groups of defendants are involved in this case, all indicted during 1980 by federal grand juries in the Northern District: (1) the "real estate" defendants, indicted jointly for criminal antitrust violations; (2) the "garbage case" defendants, also indicted jointly for antitrust violations; and (3) the "individual" defendants, indicted separately for various federal crimes. Although one of the individual defendants was charged by information rather than by indictment, he will be treated for purposes of this appeal as though indicted.
 
 
 3
 In August 1980, the real estate defendants filed a motion to dismiss their indictment on the ground the grand jury selection process violated the Jury Selection and Service Act (the "Act"), 28 U.S.C.A. § 1861 et seq., and the Local Plan adopted thereunder. They also asserted various constitutional deficiencies. This motion culminated several months of investigation of grand jury records and practices in the clerk's office. The garbage case and individual defendants later filed motions to dismiss which were based on the findings and claims of the real estate defendants.
 
 
 4
 Proceedings on the motions were consolidated by agreement of the parties. In January 1981, the district court held a nine-day hearing in which it received evidence consisting of voluminous exhibits, live testimony and depositions, and heard extended oral arguments of counsel.
 
 
 5
 In a lengthy opinion, the court rejected the Government's challenge to the timeliness of the real estate and garbage defendants' claims. On the merits, the court found numerous violations by the clerk's office of the Act and Local Plan. Holding the violations to be substantial, it dismissed the indictments pursuant to the Act.[1] Because of its disposal of the case on statutory grounds, the court declined to reach the constitutional issues.
 
 
 6
 The Government appeals from the dismissal of five of the indictments: those of the real estate and garbage case defendants and three of the individual defendants. It challenges both the rejection of the timeliness claim and the finding of substantial violations of the Act.
 
 
 7
 I. The Jury Selection and Service Act and the Local Plan
 
 
 8
 Before addressing the specific issues, which relate generally to how the clerk drew names from the jury wheels and excused persons from jury service, it will be helpful to briefly outline the general statutory scheme as well as the jury selection process in the Northern District of Georgia. The Jury Selection and Service Act, enacted in 1968, seeks to ensure that potential grand and petit jurors are selected at random from a representative cross section of the community and that all qualified citizens have the opportunity to be considered for service. 28 U.S.C.A. § 1861. See also H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Admin.News 1792, 1792 (hereinafter House Report ). The Act prohibits discrimination on account of race, color, religion, sex, national origin, or economic status. 28 U.S.C.A. § 1862.
 
 
 9
 The Act provides that each district court shall devise a written plan, known as a "local plan," to achieve the twin objectives of nondiscrimination and opportunity of service. The plan must be approved by the judicial council of the circuit in which the district is located.[2] While leaving the district courts a certain degree of flexibility in designing a plan to accommodate local conditions, the Act does prescribe a general procedural scheme to be followed.
 
 
 10
 A Local Plan was devised for the Northern District and approved by a reviewing panel of this Circuit's Judicial Council. Pursuant to the Act and Plan, the district uses voter registration lists from each of its counties. Names are selected from the lists to assure proportional representation for the four divisions in the district. A master wheel computer tape is then created in which the selected names are placed in alphabetical order and each name is given a number. The tape retains divisional identity for each name.
 
 
 11
 The names on the master wheel are used to construct the qualified jury wheels, one for each division. The computer, which is operated by the General Services Administration (GSA), addresses standard Juror Qualification Questionnaires to the persons on the master wheel. These forms are mailed with the request they be signed, dated and returned to the clerk's office.
 
 
 12
 Upon receipt by the clerk's office, the questionnaires are screened to determine whether they should be included or excluded from the respective qualified wheels. There are several grounds on which persons may be excused, exempted or disqualified from jury service. These will be discussed more fully later.
 
 
 13
 When a prospective juror is found qualified, this fact is noted on a computer card. The card is then returned to the GSA, which feeds the information to the computer for recording on the master wheel tape. Thus, the qualified wheels consist of prospective jurors marked "qualified" on the master wheel tape. There is apparently no separate tape or computer printout of only qualified jurors.
 
 
 14
 When the court requires a panel of jurors, grand or petit, it sends an order to the clerk's office. The clerk or his designate is responsible for drawing the names for the panel, selected in proportion to the number of qualified jurors in each division. A grand jury panel usually numbers fifty, of which 33 are picked from the Atlanta division, 8 from Rome, 5 from Newnan, and 4 from Gainesville. Angela Turner, the jury clerk, was placed in charge of this selection process in the Northern District.
 
 
 15
 To select the names for a given panel, the following procedure is used. An "increment" or "quotient" number is first calculated for each division. An increment equals the number of qualified jurors remaining in a division's qualified wheel divided by the number of jurors needed from that division. For example, if the qualified wheel for the Atlanta division contains 16,500 names and 33 names are needed from that division, the increment would be 16,500 / 33, or 500. The jury clerk then selects a "starting number," which is to be drawn at random from a drum or a wheel containing cards numbered from one to the increment number. Public notice is required to be posted both before and after the selection of starting numbers.
 
 
 16
 Once the increment and starting numbers have been chosen for each division, the jury clerk fills out "transmittal" forms which are delivered to the GSA. The GSA then picks, as the first name from each divisional wheel, the prospective juror whose position in the qualified wheel corresponds to the starting number picked by the clerk's office. Thereafter the computer selects each qualified juror whose position falls one increment number farther down the list, until the requisite number of jurors is obtained. For example, if the increment for the Atlanta division is 500 and the starting number is 100, the persons on the qualified wheel at positions 100, 600, 1100, 1600 and so on would be chosen until 33 names are selected.
 
 
 17
 The persons selected from the computer are mailed a summons for jury service. They have an opportunity at that time to request an excusal from service on the basis of hardship or inconvenience. If such an excuse is granted, the GSA is notified so that it may enter the information on the computer tape. Persons permanently excused are removed from the qualified wheel, while those whose service is merely deferred remain in the wheel and are subject to being called for later service.
 
 
 18
 In addition to prescribing the procedures for local plans, the Act also sets out the exclusive methods by which noncompliance may be challenged. 28 U.S.C.A. § 1867(e). For criminal cases, it provides for the dismissal of an indictment, following proper objection, upon a court's determination of a "substantial" failure to comply with the statutory procedures. 28 U.S.C.A. § 1867(a). A motion to dismiss must be filed together with a sworn statement "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier."[3]
 
 
 19
 This timeliness requirement was provided to prevent dilatoriness and to ensure the rapid disposition of claims, particularly those that are spurious. House Report, supra, at 1805. It is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act. See, e. g., United States v. Hawkins, 566 F.2d 1006 (5th Cir.), cert. denied, 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978); United States v. Kennedy, 548 F.2d 608 (5th Cir.), cert. denied, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977); United States v. De Alba-Conrado, 481 F.2d 1266 (5th Cir. 1973). As this Court noted in Kennedy :
 
 
 20
 In the Act, Congress set out a uniform, relatively strict scheme for jury selection. Congress included a new remedy for substantial violations of the Act, regardless of whether the litigant challenging the jury had been prejudiced by the jury selection. As a price for this remedy, Congress was entitled to exact strict compliance with formal procedural rules.
 
 
 21
 548 F.2d at 613.
 
 
 22
 With this background, we consider first the issue of timeliness and then the merits of the claims of noncompliance.II. Timeliness
 
 
 23
 The Government contends that certain claims of the real estate defendants that were added after an original timely motion, and all claims of the garbage case defendants, who asserted the claims previously made by the real estate defendants, were not timely presented. It is therefore necessary to examine in detail the chronology of these claims. Since the Government does not challenge the timeliness of the claims of the individual defendants, we assume they were timely made.
 
 
 24
 1. Real Estate Defendants.
 
 
 25
 The real estate defendants were indicted on March 20, 1980. On July 17, the magistrate assigned to the case ordered them to file a motion to dismiss the indictment on the ground of noncompliance with the Act within three weeks of the receipt of certain materials from the clerk's office. On August 18, the real estate defendants filed this motion which, in addition to alleging numerous violations of the Act and Local Plan, asserted various constitutional claims. The Government does not challenge the timeliness of this motion or the claims presented therein.
 
 
 26
 On December 8, the real estate defendants added further statutory and constitutional claims by amendment to their motion. The district court held the amendments timely only to the extent of the constitutional claims, and the Government does not challenge this holding.
 
 
 27
 The claims to which the Government does object for lack of timeliness were asserted in January 1981, in response to testimony by the jury clerk at the evidentiary hearing. The clerk testified that rather than use a drum or wheel to select starting numbers for the drawing of grand jurors, she generally chose the numbers either out of her head or by flipping at random to page numbers in a book. She also admitted that she did not properly put up public notices of the starting number selection. The real estate defendants thereupon argued to the court that the methods by which the starting numbers were chosen as well as the lack of public notices were substantial violations of the Act and Local Plan, although these violations were not alleged in the written motion. Defendants apparently filed no formal motion or amendment to this effect.
 
 
 28
 In contending these claims were timely presented, defendants offer two arguments. They first contend their original motion filed in August generally raised the issue of improper selection of starting numbers, which sufficiently included the post-hearing claims. Defendants alternatively argue that even if the claims were not adequately presented in the original motion, they did not and could not discover prior to the January hearing the facts underlying the claims.
 
 
 29
 In their August motion, defendants objected to the starting number selection solely on the ground the jury clerk chose the numbers from a drum which contained an array of cards numbered from 1 to 280, rather than an array numbered from 1 to the increment, as prescribed by the Local Plan. They claimed the failure to use the proper number of cards "effectively eliminated" a certain percentage of persons on the qualified wheels from being called for service. Defendants did not allege in this motion either that the jury clerk used methods other than the drum to select starting numbers or that she failed to post public notice.[4]
 
 
 30
 Defendants' argument essentially is that if any claims of noncompliance are raised with respect to a particular aspect of the jury selection process, then any violations subsequently discovered at an evidentiary hearing relate back to the original motion for purposes of timeliness. There is no support for this contention either in the language or the legislative history of the Act.
 
 
 31
 The timeliness and sworn statement requirements of the Act provide that the motion to dismiss must state the "facts" and "grounds" on which the motion rests. 28 U.S.C.A. §§ 1867(a), (d). The purpose of these requirements is to allow the court to quickly assess the merits of the motion and to determine whether an evidentiary hearing is warranted. House Report, supra, at 1805-06. If a hearing is ordered, the Act entitles defendants to "present in support of such motion the testimony of the ... clerk, if available, any relevant records and papers not public or otherwise available used by the ... clerk, and any other relevant evidence." 28 U.S.C.A. § 1867(d) (emphasis supplied). The Act, then, contemplates that the purpose of the hearing is to substantiate claims asserted in the motion and not to serve as a "fishing expedition" by defendants to uncover possible grounds for additional claims.
 
 
 32
 Defendants are entitled to inspect jury records and other papers during the preparation of the motion and are given reasonable time to otherwise investigate possible violations. 28 U.S.C.A. § 1867(f). See also Government of Canal Zone v. Davis, 592 F.2d 887 (5th Cir. 1979). Violations which are discovered or could have been discovered during this investigatory stage must be alleged in the motion and sworn statement, and failure to do so will preclude their assertion either at the evidentiary hearing or at any later point. Cf. United States v. Hawkins, 566 F.2d 1006 (5th Cir.), cert. denied, 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978); United States v. Kennedy, 548 F.2d 608 (5th Cir.), cert. denied, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977).
 
 
 33
 Defendants admittedly did not discover during their investigation the facts underlying the allegedly improper methods of selecting starting numbers and the lack of public notice. The issue becomes whether they could have discovered these facts by the exercise of diligence. 28 U.S.C.A. § 1867(a).
 
 
 34
 Defendants' intensive investigation of grand jury practices began prior to indictment. They employed an investigator who conducted a "review of documents in the office of the clerk ... and interviews (with) various employees of this court."[5] In addition, one of the defense attorneys spoke with the jury clerk in March 1980 with respect to the selection of starting numbers.[6] There is no indication either the attorney or the investigator asked the jury clerk or other employees whether any methods other than the drum were used to select starting numbers or whether public notices were properly posted.
 
 
 35
 Defendants rely heavily on the fact that during the meeting between the attorney and the jury clerk, the clerk at one point refused to answer any further questions, apparently because she became flustered and had been asked by the Government attorneys not to speak with defense counsel unless they were present. Defendants fail to explain, however, why they could not have sought permission of the Government attorneys or of the court to continue the questioning, or why the other investigator could not have discovered the alleged violations.
 
 
 36
 Defendants had another opportunity to discover the alleged violations after their original motion was filed. In a prehearing brief filed by the Government on October 14 in response to defendants' motion, the Government stated:
 
 
 37
 Defendants have contended ... that the Jury Clerk did not determine the starting number from a sufficiently large range of numbers. That is, they claim that the numbers from which the starting number was selected were not as large as the quotient. This is not correct. However, there was a misapprehension on the part of the Jury Clerk as to how to select the starting number from among the numbers in the prescribed range. This fact was not discovered by the defendants, but by the United States in its review of procedures used in jury selection.[7]
 
 
 38
 This statement was made while a second investigation of jury procedures was underway, this time conducted by the real estate defendants in coordination with the garbage case defendants. Although the Government did not further describe what the "misapprehension" of the jury clerk was, defendants were at least put on notice of possible violations which they had not previously discovered. Thus, even though defendants may have been hampered by the jury clerk in the initial investigation, they have not fully explained their subsequent failure to determine the nature of the improprieties to which the Government referred.
 
 
 39
 It appears doubtful, then, that defendants exercised diligence in investigating and inquiring about the selection of starting numbers and the posting of notices. Nevertheless, because it is unclear from the record whether defendants were "misled or that needed information was withheld from them," see United States v. Geelan, 509 F.2d 737, 740 (8th Cir. 1974), cert. denied, 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 666 (1975), in an effort at judicial efficiency we go ahead and consider these claims on the merits in Section III.
 
 
 40
 2. Garbage Case Defendants.
 
 
 41
 The garbage case defendants were indicted on May 29, 1980. On June 5, the magistrate assigned to the case imposed a July 15 deadline for the filing of pretrial motions. Defendants did not file their jury challenge motion by this date.
 
 
 42
 At a July 22 hearing, the magistrate and counsel for the garbage case defendants discussed the ongoing investigation of the real estate defendants as well as the type of jury challenge motion counsel intended to file. Counsel did not seek access to jury records concurrent with the real estate defendants or otherwise engage in their own investigation, because they believed "it would have disrupted the process for us to go in there at the same time."[8] They instead intended to rely on the findings of the real estate defendants. Although the magistrate allowed counsel an additional two weeks to file their motion, this deadline also was not met.
 
 
 43
 The garbage case defendants finally filed their jury challenge motion on August 28. The motion was primarily a photocopy of the real estate defendants' motion, which had been filed 10 days earlier. The magistrate later held a hearing requiring defendants to show cause why their August 28 filing was not in violation of the deadlines established for filing motions, but the magistrate never made a formal ruling on this issue.
 
 
 44
 In October, the garbage case and real estate defendants coordinated their investigatory efforts, which culminated in the previously mentioned December amendments to the original motions of both groups of defendants. The garbage case defendants also asserted after the January hearing claims based on the selection of starting numbers and the posting of notices. The Government objected to the timeliness of both the original and amended motions as well as the claims asserted after the January hearing.
 
 
 45
 The district court, finding the original motion did not strictly comply with the timeliness requirement of the Act, nevertheless held it had authority to entertain an out-of-time motion upon a showing of "reasonableness" or "exigent or compelling circumstances." 510 F.Supp. at 676. It then held the garbage case defendants reasonably delayed filing their motion until 10 days after the filing of the real estate defendants' motion, because prior to this time "all that (defendants) could have (filed) would be no more than a paper record, unsupported by factual averment." Id. The court also held the December amendments timely to the extent of the constitutional claims, a ruling not challenged by the Government, but did not address the timeliness of the January claims.
 
 
 46
 Although we doubt that under the statute the district court has the authority to excuse strict compliance with the time requirements of the Act on equitable grounds, we need not focus on that point. Even assuming the garbage case defendants could delay in reliance on the efforts of the real estate defendants, the ten-day delay in filing a motion after the real estate motion did not comply with the seven-day requirement of the Act. 28 U.S.C.A. § 1867(a). Where a defendant relies on a jury challenge motion filed by another defendant, the seven-day period provided in the Act for filing a motion begins to run from the date the defendant has knowledge or could have obtained knowledge of the earlier motion. See United States v. Foxworth, 599 F.2d 1 (1st Cir. 1979); United States v. Greene, 489 F.2d 1145 (D.C.Cir.1973), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974).
 
 
 47
 In Foxworth, the motion to dismiss pursuant to the Act was filed nine days after the indictment and eight days after appointment of defense counsel. Counsel had earlier filed a similar motion in another case. The First Circuit held that since the grounds for the motion were known to counsel at the time of his appointment, the eight-day delay in filing the motion exceeded the time limit established by section 1867(a). 599 F.2d at 3 n.3.
 
 
 48
 Greene is also analogous. In that case, the motion to dismiss was filed by the public defender in January 1972, on the day of trial. A similar motion had been filed in another criminal case in October 1971, by attorneys in the same public defender's office. The District of Columbia Circuit held the January motion was untimely. Because the basis for the motion became known or could have become known to counsel at the time the earlier motion was filed, the seven-day period had expired. 489 F.2d at 1148. See also United States v. Geelan, 509 F.2d 737 (8th Cir. 1974), cert. denied, 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 666 (1975) (motion filed 36 days after arraignment untimely, where basis for motion could have been discovered upon inquiry); United States v. Rickus, 351 F.Supp. 1386 (E.D.Pa.1972), affirmed, 480 F.2d 919 (3rd Cir.), cert. denied, 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243 (1973) (motion filed after voir dire of jury untimely where defense counsel could have investigated the matter earlier); United States v. Arnett, 342 F.Supp. 1255 (D.Mass.1970) (motion filed 39 days after indictment untimely where defense counsel could have discovered the alleged defects by looking at the local plan).
 
 
 49
 The garbage case defendants argue it was reasonable for them to spend ten days reviewing the real estate motion in order to decide whether to adopt it. That is not the point. Since defendants had already delayed the filing of a motion for several months to await the findings of the real estate defendants, they were required to exercise diligence in obtaining a copy of the real estate motion and acting upon it within seven days. Failure to do so forecloses a jury challenge under the Act. United States v. De Alba-Conrado, 481 F.2d 1266 (5th Cir. 1973).
 
 
 50
 As noted earlier, the seven-day time limit expressly provided in the Act was intended to be strictly enforced. Defendants' argument that it provides an insufficient amount of time to file a jury challenge is best addressed to Congress, not to this Court. Cf. Harrison v. PPG Industries, 446 U.S. 578, 593, 100 S.Ct. 1889, 1898, 64 L.Ed.2d 525 (1980) (Where language and legislative history are clear, argument that statutory provision is unreasonable must be addressed to Congress).
 
 
 51
 The remaining issue is the timeliness of the starting number and public notice claims, asserted by both the real estate and the garbage case defendants after the January evidentiary hearing. While we held it was doubtful whether the real estate defendants exercised reasonable diligence in discovering these violations, it is clear the garbage case defendants exercised no diligence. Unlike the real estate defendants, the garbage case defendants cannot claim they were misled by the jury clerk or that information was withheld from them, since they made absolutely no effort to investigate. Because of their lack of diligence, we hold the claims they asserted after the January hearing were untimely.
 
 
 52
 To summarize, we hold the real estate and individual defendants timely filed their motions to dismiss, but the garbage case defendants failed to timely present any of their claims. We also conclude the claims asserted by the real estate defendants following the January hearing should be reviewed on the merits, although we maintain serious doubt whether they were timely made.
 
 III. The Merits
 
 53
 The violations alleged by the real estate defendants fall into four general categories: (1) improper methods by which starting numbers were selected; (2) failure to post public notice of these selections; (3) erroneous excusals, exemptions and disqualifications of prospective jurors from the qualified jury wheels; and (4) erroneous permanent excusals by the jury clerk of jurors who had been summoned. The individual defendants assert all but the starting number and notice claims, since these improprieties were corrected prior to their indictment.
 
 
 54
 Before examining the alleged violations in detail, it is important to emphasize the standard under which they are reviewed. The Act, as noted previously, provides for the dismissal of an indictment only when there has been a substantial failure to comply with the statutory provisions in selecting the grand or petit jury. 28 U.S.C.A. § 1867(a). The word "substantial" was added by Congress to allow room for the doctrine of harmless error. House Report, supra, at 1805.
 
 
 55
 Whether there has been a substantial failure to comply requires that the alleged violations be weighed against the underlying principles of the Act. United States v. Maskeny, 609 F.2d 183, 191 (5th Cir.), cert. denied, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); United States v. Davis, 546 F.2d 583, 589 (5th Cir.), cert. denied, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). The legislative history states the Act embodies two important general principles:
 
 
 56
 (1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.
 
 
 57
 House Report, supra, at 1793. A substantial violation of the Act will be found only when these principles are frustrated. Mere "technical" deviations from the Act or even a number of them are insufficient. United States v. Davis, supra, 546 F.2d at 589; United States v. Evans, 526 F.2d 701, 706 (5th Cir.), cert. denied, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976).
 
 
 58
 The same analysis is applied for claims alleging a failure to comply with the Local Plan. The court must determine whether noncompliance with the Plan has resulted in a substantial violation of the Act and its underlying principles. See United States v. Rodriguez, 588 F.2d 1003, 1009 n.21 (5th Cir. 1979). See also United States v. Tarnowski, 429 F.Supp. 783, 788-89 (E.D.Mich.1977), affirmed, 583 F.2d 903 (6th Cir. 1978), cert. denied, 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979); United States v. Gurney, 393 F.Supp. 688, 701 (M.D.Fla.1974). The mere claim the Plan has been violated is insufficient, absent a further showing the Act itself and its goals have been frustrated.
 
 
 59
 1. Starting Number Selection.
 
 
 60
 The Local Plan provides that starting numbers should be drawn by lot from a drum or box containing consecutively numbered cards covering the same range of numbers as the increment. Local Plan 90a. The jury clerk, however, rarely complied with this requirement, although she was given a "wheel" (drum) by the Clerk of Court and directed to use it. The jury clerk instead employed one of two methods. The first was the "book method," in which she would flip at "random" to a page in a dictionary and use the page number as the starting number. Beginning in 1976, she also used the so-called "Turner method," which entailed picking a number out of her head. On several occasions, the jury clerk asked her assistant to pick a number out of his head.
 
 
 61
 Defendants, of course, may challenge only improprieties affecting the particular grand jury which indicted them. Cf. United States v. Davis, 546 F.2d 583, 586 (5th Cir.), cert. denied, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977) (court may not reach challenge to system of using volunteer jurors where none were called in that case). The testimony of the jury clerk, however, was unclear on which method she used to select the starting numbers for the indicting grand jury. At one point, she said she was "certain" she used the book method, while at a later point she testified she predominantly used the Turner method during the period this grand jury was chosen. Because it appears certain that one of the two was employed, we consider the validity of both.
 
 
 62
 The district court held the methods substantially violated the "random selection" requirement of the Act.[9] It first found they resulted in a statistically nonrandom selection of starting numbers, because a disproportionate percentage of numbers were in the lower range of the increment. For example, the 10 grand jury starting numbers chosen for the Atlanta Division during a two-year period were within the range of only 8% to 40% of the highest possible increment number. A statistically random method would have resulted in starting numbers spread over the entire increment range. In addition, since the jury clerk unintentionally favored certain numbers, there were several repeats of starting numbers that would not have occurred by the use of a completely random process.
 
 
 63
 The importance of this allegedly nonrandom selection was that the chances of qualified wheel members to be picked were not substantially equal. Evidence indicated that because of the concentration of starting numbers in the lower range and the repeat of certain numbers, some members of the wheel had less chance to be selected, particularly those at the very end of the wheel. The Government expert, however, testified that despite this initial effect, over the passage of time the likelihood that a particular juror would be chosen was approximately equal to that of any other person on the qualified wheel.
 
 
 64
 Analysis of required randomness in a statistical sense misses the mark. The legislative history makes clear that Congress did not intend for "random selection" under the Act to be defined as "statistical randomness":
 
 
 65
 (T)o the extent that the bill does provide for random selection, it does not insist upon randomness in the sense in which that term might be understood by statisticians. Many districts may seek the aid of statisticians in developing systems of selection that do meet the standards of that profession, and they are encouraged to do so. No doubt such systems enhance the likelihood of attaining the cross sectional goal of the bill. But for reasons of administrative feasibility your committee did not deem it necessary to require the use of random selection in the statistical sense. It is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups.
 
 
 66
 Thus, for example, the plan may specify selection of every 70th name from the voter list, or every name at the bottom of a page in the list, or all the names on the list, even though in certain cases statisticians might not agree that truly random selection would be the result. Likewise, in drawing names from the master and qualified jury wheels some similar processes may be designated. Under this definition of randomness, the plan may also permit courts to continue to use "rotation methods" or "jury pools" in assigning persons to grand and petit juries, provided that these methods, too, are free from any taint of impermissible discrimination against groups or individuals.
 
 
 67
 S.Rep.No. 891, 90th Cong., 1st Sess. 16 n.9 (1967). The underlying concern, then, is that the methods used must not result or have the potential to result in discrimination among cognizable groups of prospective jurors. While the methods used here by the jury clerk were "statistically nonrandom," there is no showing they either allowed discriminatory selection of jurors or otherwise prevented jury panels from consisting of fair cross sections of the community. For example, in United States v. Blair, 493 F.Supp. 398, 410 (D.Md.1980), defendants challenged the Clerk's practice of dropping excess names from the end of jury lists, which resulted in the exclusion of persons whose last names began with "X," "Y," and "Z." The court held this practice, while statistically nonrandom, did not exclude a cognizable group or result in an unrepresentative selection of jurors. Cf. United States v. Smith, 588 F.2d 111 (5th Cir. 1979) (practice of putting back on the qualified jury wheel the names of persons who had served more than two years previously did not affect the inherently random nature of the selection process, because jury panels were still selected at random from a large group of persons, and did not frustrate the purposes of the Act).
 
 
 68
 The district court next held the methods used by the jury clerk created a "theoretical" possibility of abuse by permitting the jury clerk to nonrandomly designate one or more qualified jurors on a particular grand jury. According to this theory, if the jury clerk knew a particular person's position on the qualified wheel, she could deliberately choose a starting number out of her head or out of the book which would ensure the person would be selected by the computer for service on the jury. For example, if she knew a person's position on the wheel was 600 and the increment was 500, the jury clerk could choose a starting number of 100 in order to guarantee that person's selection. The court noted that while "there is neither evidence nor even an allegation that (the jury clerk) or anyone else attempted to manipulate the system with this purpose in mind, ... one cannot rule out the possibility for abuse in defeating random jury selection." 510 F.Supp. at 691.
 
 
 69
 We find the possibility of abuse to be not just "theoretical" but almost nonexistent. The crucial flaw in the theory is that it would have been practically impossible for the jury clerk or anyone else in the clerk's office to discover a person's position on the qualified wheel, particularly after a number of grand and petit juries had been selected. Apparently no printout exists of persons on the qualified wheel. While the clerk's office does have individual computer cards for each person on the wheel, they are kept in a locked cabinet by the Clerk of Court and are not available to the jury clerk or other employees.
 
 
 70
 Even assuming access could be gained to the computer cards, it would still be extremely difficult to determine a person's position at a given point in time. There were over 30,000 separate computer cards representing persons on the qualified wheel. As wheel members were selected for jury service and their names removed, the relative positions of the remaining persons on the wheel changed. For example, if persons in positions 2 and 3 were selected, the wheel member in position 4 would be shifted to position 2, position 5 shifted to position 3, and so on. Thus, in order to determine a person's present position on the wheel, it would be necessary to sort the 30,000 cards to reflect the removal of all previously-selected persons. If even a single card was out of order or was improperly included or excluded, the positions of the remaining persons would be miscalculated. Since approximately ninety grand and petit jury panels were chosen from the wheel prior to the jury which indicted defendants, the relative positions of the remaining qualified jurors obviously changed substantially from the original order of the wheel.
 
 
 71
 Defendants analogize this case to United States v. Kennedy, 548 F.2d 608 (5th Cir.), cert. denied, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977), in which the jury clerk, to satisfy a deficiency in the number of prospective jurors, sought volunteers from the list of persons who had served at the previous court term. This Court held the practice, which deviated from express statutory procedures, to be a substantial violation of the Act's "random selection" requirement.
 
 
 72
 In Kennedy, there was no question the practice resulted in the nonrandom selection of jurors because the jury clerk on an ad hoc basis directly contacted particular jurors who then were given complete discretion on whether to serve. Thus the pool from which the jurors came was itself selected, rather than randomly chosen. In the present case, the practices challenged created only the slim chance that particular jurors could be designated by the jury clerk. We cannot conclude this mere possibility frustrated the randomness principle of the Act.
 
 
 73
 We hold the jury clerk's methods of selecting starting numbers did not constitute a substantial violation of the Act. They do not comply with the Local Plan, however, and we take note the Government's statement that the practices have since been discontinued.
 
 
 74
 2. Posting of Public Notices.
 
 
 75
 Under the Local Plan, the clerk's office was required to post public notices on the clerk's bulletin board both before and after each drawing of starting numbers. The first notice was to provide the time and date of the drawings, which were open to the public, while the second notice was to indicate which numbers were selected as well as the date of the computer selection of names from the qualified wheel. The Plan has since been amended to eliminate the second notice requirement.
 
 
 76
 The jury clerk testified she rarely complied with the first notice requirement. On most occasions, she or her assistant posted both notices simultaneously only after the drawings. On one or two occasions, when pressed for time, the jury clerk posted no notices at all. On the infrequent times when prior notice was posted, the drawings were held only a few hours later. The drawings, however, were held in rooms open to the public. These practices continued despite instructions by the Clerk to post notices at the proper time.
 
 
 77
 As with the selection of starting numbers, it is unclear when the notices were posted with respect to the grand jury which indicted these particular defendants. It appears likely, however, the notices were not properly posted.
 
 
 78
 The failure to post notices violated both the Local Plan and the Act. While the Act does not expressly require public notice for starting number drawings, it does provide the selection of qualified jurors should be made publicly upon reasonable notice.[10]
 
 
 79
 The failure to provide public access to drawings, however, does not necessarily constitute a substantial violation of the Act. See United States v. Davis, 546 F.2d 583 (5th Cir.), cert. denied, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977); United States v. Dalton, 465 F.2d 32 (5th Cir.), cert. denied, 409 U.S. 1062, 93 S.Ct. 570, 34 L.Ed.2d 515 (1972). In Dalton, we held the selection of juror names in the clerk's office with only clerk personnel in attendance was not an invalid procedure, because, as here, the drawing took place in a room open to the public. 465 F.2d at 34. Similarly, in Davis, the Court held the failure to provide public access to the computerized selection of jurors was not a substantial violation, because the practice in no way affected the random nature or objectivity of the selection process. 546 F.2d at 589. See also United States v. Huber, 457 F.Supp. 1221, 1230-31 (S.D.N.Y. 1978) (failure to publicly draw starting numbers was not a substantial violation).
 
 
 80
 The district court held the lack of proper notice was a substantial violation because it "masked deviations" in the methods by which the jury clerk selected starting numbers. 510 F.Supp. at 694. It relied on dictum in Davis, supra, 546 F.2d at 589:
 
 
 81
 If we were left in the dark about the procedures employed behind closed doors, or if we had reason to believe that there were any improprieties which had escaped detection as a result of non-public drawings, the result might be different. In such a case, of course, the concern would be not with the procedures themselves but rather with their effect on the random nature and objectivity of the selection.
 
 
 82
 As we held above in this case, however, the starting number methods used by the jury clerk, though not in compliance with the Local Plan, did not substantially affect the randomness or objectivity of the selection process. Moreover, the jury clerk testified the failure to post notices was the result of time pressures and was not an attempt to conceal the manner in which she chose starting numbers. This testimony was not disputed. We therefore conclude the lack of public notice here was not a substantial violation of the Act.
 
 
 83
 3. Erroneous Excusals, Exemptions and Disqualifications.
 
 
 84
 The Act provides the Local Plan shall specify grounds for excusal, exemption and disqualification of prospective jurors. A person "disqualified" or "exempt" is automatically barred from jury service, whether or not exclusion is requested.[11] A person "excused" from jury service, however, must request excusal to be relieved of the obligation to serve.[12]
 
 
 85
 The questionnaire sent to each person on the master wheel included a section listing the grounds for excusal, and instructed the recipient to "mark that excuse which applies to you if you demand to be excused for that reason" (emphasis in questionnaire). The questionnaire also sought information relevant to possible grounds for exemption or disqualification. Persons not excused, exempted, or disqualified were placed on the qualified wheels.
 
 
 86
 The qualified wheels at issue in this case were constructed beginning in mid-1976. Questionnaires were sent to the 59,352 persons whose names were on the master wheel, and 42,105 completed forms were returned.
 
 
 87
 The jury clerk and her assistants screened the returned questionnaires to determine whether the persons should be included or excluded from the qualified wheels. 30,230 persons were ultimately placed on the qualified wheels. The remaining 11,875 were found to be either excused, exempted, or disqualified.
 
 
 88
 Based on an intensive review of the questionnaires, defendants alleged that 1,537 persons were erroneously excluded. The district court, after reviewing the disputed questionnaires, agreed that 495 persons had been improperly excluded. With respect to the remaining persons challenged, the court found that some were in fact properly excluded. It held it unnecessary to rule upon the others, for reasons not clear from the opinion. 510 F.Supp. at 699 n.47.
 
 
 89
 The alleged erroneous exclusions were made on the basis of age, occupation, intradistrict moves, or prior jury service. We first consider whether these exclusions were in error and then determine whether, if so, they constitute a substantial violation of the Act.
 
 
 90
 Age. The Local Plan provides for excusal upon request of "all persons over 70 years of age at time of executing the jury qualification form." Local Plan 88. The district court found that 178 persons were improperly excused under this provision.[13] Of these, 135 aged 70 or over were excluded even though they had not requested excusal on their questionnaires. The remaining 43 had been excused even though they had not yet reached 70. Some of these persons requested excusal on their questionnaires on the ground they were nearly 70, while others made no such indication. These age excusals apparently were the result of a misunderstanding by some clerk personnel that persons over 70 were to be excused regardless if they had requested it, and that persons nearly 70 were entitled to be excused.
 
 
 91
 With respect to the first group, the Government admits the clerk's office was in error. With respect to the second group, the Government argues it was a reasonable interpretation of the Plan to exclude persons who were nearly 70, since it was probable they would reach that age by the time they were called for service. We disagree. The Plan is explicit that only persons 70 at the time of executing the form could request excusal under this provision. It may not be improper under the Plan, however, to permit persons who had turned 70 by the time they were summoned to seek at that point an excusal on the basis of age.
 
 
 92
 Occupation. The Plan provides for excusal upon request of "all actively practicing attorneys, physicians, dentists, and registered nurses," as well as "all ministers of the gospel and members of religious orders actively so engaged." Local Plan 87-88. It also provides for the exemption of military personnel, firemen, policemen, and public officers. Local Plan 88.
 
 
 93
 The district court held that at least 72 persons were wrongfully excluded from the qualified wheel by reason of their occupation. The majority of these persons were registered nurses who did not request excusal on that basis. The Government does not appear to dispute this finding of error.
 
 
 94
 Intradistrict Moves. Both the Act and Plan provide that persons may be qualified for jury service only if they have "resided for a period of one year within the judicial district." 28 U.S.C.A. § 1865(b)(1); Local Plan 89. The district court found the clerk's office erred in disqualifying 159 persons under this provision because they had moved from one division in the Northern District to another, even though they had remained within the district for at least one year despite these moves. In addition, 25 persons were found to be wrongfully excluded because of intradivisional moves. The Government does not dispute this latter finding.
 
 
 95
 Neither the Act nor the Plan provides for the disqualification of a person on the basis of an interdivisional move. See United States v. Rosenthal, 482 F.Supp. 867, 873 (M.D.Ga.1979). A prospective juror is only required to reside within the district for a period of one year. If this requirement is satisfied, whether or not a person has moved among divisions within the district during the year is irrelevant. Moreover, there is no evidence of an operational problem for the computerized selection system in placing the name of a person who has moved on the qualified wheel of either the prior or present division of residence.
 
 
 96
 Prior Jury Service. The Local Plan provides excusal for "any person who has served as a grand or petit juror in a federal court during the past two years immediately preceding his call to serve." Local Plan 88 (emphasis supplied). The clerk personnel interpreted this provision to excuse persons who had served within two years of the date of completing the questionnaires. The district court found that 61 persons had been wrongfully excluded on this basis. While the Government argues this practice of the clerk's office was understandable in light of the "difficulties" involved in constructing and maintaining the qualified wheels, it does not seriously argue these excusals complied with the Plan.
 
 
 97
 The district court, then, found a total of 495 wrongful exclusions in these four categories, and we uphold this finding. The issue remains whether the exclusions were a substantial violation of the Act.
 
 
 98
 For wrongful exclusions, determining whether there has been a substantial violation has both quantitative and qualitative aspects. Quantitatively, a substantial violation generally will not be found if the number of errors is small. House Report, supra, at 1805. Qualitatively, the inquiry is whether there has been a frustration of the Act's underlying principle of exclusions on the basis of objective criteria only. Id. at 1793. The application of extrastatutory, subjective criteria in the selection process in contravention of this principle may require a finding of a substantial violation even though the number of errors is relatively small. See United States v. Evans, 526 F.2d 701 (5th Cir.), cert. denied, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976).
 
 
 99
 With respect to the quantitative aspect, the number of errors found in the present case is insignificant in relation to the large number of prospective jurors handled by the clerk's office. The persons wrongfully excluded comprised only 1.2% of those screened by the clerk personnel, and only 1.6% of those placed on the qualified wheels.[14] Thus, the pool of available jurors would have increased only slightly if these errors had not been made. Compare United States v. Evans, 526 F.2d 701 (5th Cir.), cert. denied, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976) (small number of wrongful inclusions and exclusions of persons from qualified wheel is not substantial violation); United States v. Rosenthal, 482 F.Supp. 867 (M.D.Ga.1979) (small number of persons wrongfully excused for intradistrict moves is insubstantial); United States v. Armsbury, 408 F.Supp. 1130 (D.Ore.1976) (wrongful inclusion of 153 persons on a qualified jury wheel numbering 2,705, a 5.6% error rate, is not a substantial violation); United States v. Matthews, 350 F.Supp. 1103 (D.Del.1972) (wrongful excusal of 17 persons out of 2,400 on the master wheel, or a .7% error rate, is insubstantial), with United States v. Hill, 480 F.Supp. 1223 (S.D.Fla.1979) (excusal by clerk of 31 of 77 grand jurors called, or 40.3%, which left only 46 persons from which to pick a grand jury of 23, resulted in a substantial violation of the Act where done without authorization or knowledge of judge). See also House Report, supra, at 1805 (example of harmless error would be use of 1,990 names on master jury wheel where plan calls for 2,000, or .5% error rate). Given the time pressure involved and the limited personnel available to construct the qualified wheels, we hold the number of errors made in this case did not in itself substantially violate the Act.
 
 
 100
 As to the qualitative aspect, the district court held the wrongful exclusions were a substantial violation of the Act because they were made on the basis of "subjective, nonstatutory" criteria. 510 F.Supp. at 699-701. The court reasoned essentially that exclusions resulting from a misinterpretation of the criteria set forth in the Act and Plan violate the underlying principle which calls for the use of objective criteria only.
 
 
 101
 A review of the legislative history indicates the district court misconstrued the principle of objectivity. The subjective criteria Congress intended to prohibit in the Act included such notions as "good character, approved integrity, sound judgment and fair education." House Report, supra, at 1795. The problem recognized with their use was that "(i)n at least some instances, even though the jury selection officials were well intentioned, these additional qualification requirements have produced discriminatory results, especially in relation to the poor and other minorities." Id. Accordingly, the Act provides for the use of only objective criteria to determine whether a person is qualified or should instead be deemed disqualified, excused or exempted.
 
 
 102
 The subjective criteria contemplated and rejected by the Act, then, are those which, intentionally or not, result or are likely to result in discrimination, or which fail to produce juries representing a fair cross section of the community. House Report, supra, at 1795. The mere misinterpretation or misapplication of the objective criteria by a clerk's office does not violate the objectivity principle, in the absence of a discriminatory potential or effect. See United States v. Evans, 526 F.2d 701, 706 (5th Cir.), cert. denied, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976); United States v. Gurney, 393 F.Supp. 688, 701-05 (M.D.Fla.1974).
 
 
 103
 While the clerk personnel in this case made a number of erroneous exclusions, there is no showing they were based on subjective criteria reflecting either a discriminatory intent or effect. The errors, made in good faith, were instead the result of an occasional misinterpretation or misapplication of technical statutory criteria. In these circumstances, we cannot say the errors contravened the principle of objectivity or otherwise constituted a substantial violation of the Act.
 
 
 104
 In finding such a violation, the court also emphasized the exclusions were made by the clerk's office without proper consultation with or approval by a district court judge. Under the Act and Plan, ultimate authority over qualifications lies with the judges:
 
 
 105
 The chief judge of the district court, or such other district court judge as the plan may provide, on his initiative or upon recommendation of the clerk ..., shall determine solely on the basis of information provided on the juror qualification form and other competent evidence whether a person is unqualified for, or exempt, or to be excused from jury service.
 
 
 106
 28 U.S.C.A. § 1865(a); Local Plan 88. The extent to which the district court judges were consulted by the clerk's office during the qualification process is disputed by the parties, although it appears the clerk personnel handled most of the determinations of whether particular jurors were qualified.
 
 
 107
 The delegation to the clerk's office of initial authority to make qualification decisions has generally not been considered a substantial violation of the Act. See, e. g., United States v. Maskeny, 609 F.2d 183, 193-94 (5th Cir.), cert. denied, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); United States v. Evans, 526 F.2d 701, 706 (5th Cir.), cert. denied, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976); United States v. Jenison, 485 F.Supp. 655, 667-68 (S.D.Fla.1979); United States v. Huber, 457 F.Supp. 1221, 1231 (S.D.N.Y.1978). Cf. United States v. Davis, 546 F.2d 583, 590-92 (5th Cir.), cert. denied, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977) (delegation to the GSA the role of selecting jurors by use of the computer is not a substantial violation). While the clerk personnel should have consulted the judges and the Clerk of Court more closely when uncertainties arose with particular jurors or the general criteria to be used, the failure to do so, either in itself or when combined with the erroneous exclusions, does not warrant dismissal of the indictments.
 
 
 108
 4. Erroneous Permanent Excusals by Jury Clerk After Summoning.
 
 
 109
 Defendants challenged the practice of granting permanent excusals to persons summoned for jury service, rather than temporary excusals as contemplated by the Act and Local Plan. The evidence revealed the following:
 
 
 110
 From 1978 to February 1980, 10 grand juries were empaneled in the Northern District. 445 persons on the qualified wheels were served with summonses to report for service on these juries. Of these, 141 were excused by the clerk's office prior to reporting, with all but 3 receiving permanent excusals. Most were excused on "hardship" grounds. Defendants challenged the permanent excusal of 74 of these jurors.
 
 
 111
 In addition, the jury clerk permanently excused from jury service 74 persons who had been excused in court by the district judge, regardless of the reason for their excusal by the judge. The court found that some of these persons had been excused in court merely because they were "surplus" jurors, while others had been excused because of hardship.
 
 
 112
 The jury clerk testified she had granted permanent excusals because she did not believe that temporary excusals could be accommodated. Later testimony, however, indicated the GSA computer could have adequately handled the information. The jury clerk's practice did not comply with the Act.
 
 
 113
 The Act provides that any person summoned for jury service may be "excused by the court, upon a showing of undue hardship or extreme inconvenience, for such period as the court deems necessary, at the conclusion of which such person shall be summoned again for jury service." 28 U.S.C.A. § 1866(c) (emphasis supplied).[15] The legislative history and case law make clear that an excusal under this provision should be temporary where possible, and that the prospective juror must serve as soon as the hardship or inconvenience terminates. United States v. Kennedy, 548 F.2d 608, 612 n.6 (5th Cir.), cert. denied, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977). See also House Report, supra, at 1804.
 
 
 114
 Nevertheless, while the practice of granting permanent rather than temporary excusals failed to comply with the technical requirements of the Act, it did not rise to the level of a substantial violation. Even assuming all 212 permanent excusals were wrongful, this amounts to only .7% of the persons on the qualified wheels, an insignificant amount.[16] Moreover, there is no evidence indicating the excusals were made on the basis of improper subjective criteria. We therefore hold the district court erred in finding this practice to be a substantial violation.
 
 CONCLUSION
 
 115
 As the district court accurately noted, this case "represents perhaps the most intensive and far reaching challenge of the administration of a federal judicial district jury plan since the adoption of the Jury Selection and Service Act 13 years ago." 510 F.Supp. at 705. We find it significant, however, that after months of intensive and no doubt extremely costly investigation into the practices of the clerk's office, a relatively small number of errors was uncovered. Of more than 40,000 questionnaires screened by the clerk personnel in a short period of time, the district court found only about 500 were erroneously treated. Moreover, while the jury clerk failed to follow the Act and Local Plan precisely with respect to selecting starting numbers and posting notices, there has been absolutely no indication these errors affected the randomness of the juries within the meaning of the Act.
 
 
 116
 In sorting out the details of statutory procedures, there is perhaps a tendency to lose sight of the fundamental purpose of the law. The purpose of the Act is to prevent discrimination, whether it be on account of "race, color, religion, sex, national origin, or economic status." 28 U.S.C.A. § 1862. Where the procedural errors made by those in charge of selecting juries do not raise the possibility of frustrating this goal, a court should be hesitant to order the drastic remedy of the dismissal of indictments.
 
 
 117
 The clerk's office in this case committed errors. We do not condone them and have sought to make clear in this opinion the practices which do not comply with the statutory and plan requirements. It is assumed the practices have been or will be corrected. After reviewing the voluminous evidence and considering the arguments of counsel, however, it simply does not appear the violations established here seriously frustrated the underlying principles of the Act. The dismissal of the indictments must be reversed.
 
 
 118
 Because the district court decided this case on the basis of statutory violations, it did not reach the constitutional questions presented. We therefore remand for consideration of these issues.
 
 
 119
 REVERSED AND REMANDED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 The Act provides:
 If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate.
 28 U.S.C.A. § 1867(d).
 
 
 [2]
 The Act provides:
 Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862 of this title, and that shall otherwise comply with the provisions of this title. The plan shall be placed into operation after approval by a reviewing panel consisting of the members of the judicial council of the circuit and either the chief judge of the district whose plan is being reviewed or such other active district judge of that district as the chief judge of the district may designate. The panel shall examine the plan to ascertain that it complies with the provisions of this title. If the reviewing panel finds that the plan does not comply, the panel shall state the particulars in which the plan fails to comply and direct the district court to present within a reasonable time an alternative plan remedying the defect or defects. Separate plans may be adopted for each division or combination of divisions within a judicial district. The district court may modify a plan at any time and it shall modify the plan when so directed by the reviewing panel. The district court shall promptly notify the panel, the Administrative Office of the United States Courts, and the Attorney General of the United States, of the initial adoption and future modifications of the plan by filing copies therewith. Modifications of the plan made at the instance of the district court shall become effective after approval by the panel.
 28 U.S.C.A. § 1863(a).
 
 
 [3]
 The Act also provides for enforcement by the Attorney General in criminal cases and by either party in civil cases:
 (b) In criminal cases, before the voir dire examination begins, or within seven days after the Attorney General of the United States discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the Attorney General may move to dismiss the indictment or stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.
 (c) In civil cases, before the voir dire examination begins, or within seven days after the party discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, any party may move to stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the petit jury.
 28 U.S.C.A. §§ 1867(b), (c).
 
 
 [4]
 Defendants' claim was in pertinent part as follows:
 A violation of the Selection Plan and the Act has repeatedly occurred in this district through the jury clerk's failure to draw starting numbers as prescribed by the Selection Plan. Instead of drawing a starting number for each division by lot from an array of consecutive numbers ending with the appropriate quotient, the clerk altered the process by selecting a number from a smaller range, namely 1 through 280, inclusive.... In other words, with respect to the Atlanta Division, the clerk selected a starting number from an array of 1 to 280 rather than an array of 1 to 475.
 The result of this erroneous application of the Selection Plan is a systematic omission of eligible grand jurors from the possibility of selection. Under the system presently applied by the jury clerk, a prospective juror whose position in the qualified jury wheel is a multiple of one of the numbers omitted from the array from which the starting number was selected cannot be chosen for grand jury duty.
 Memorandum in Support of Motion to Dismiss, Vol. 21 at 827.
 
 
 [5]
 Affidavit of Don C. Huprich, Vol. 21 at 847
 
 
 [6]
 Affidavit of William W. Maycock, Vol. 21 at 865-66. The affidavit states in relevant part:
 On March 27, 1980, I spoke with Angela Turner, Jury Clerk of the Atlanta Division of the United States District Court for the Northern District of Georgia in her office at the Richard B. Russell Building in Atlanta. Mrs. Turner told me that she was the individual who drew the juror selection starting number from a drum containing numbered cards. I asked her how many cards were contained in the selection drum. She stated that there were about 350 numbers in the drum to her knowledge. In response to my inquiry about how she avoided drawing or selecting numbers larger than the selection quotient calculated for the selection of jurors for a grand jury, she stated that the situation had only occurred once and that the problem had been solved. I understood her to mean that she resolved the possibility of drawing a starting number larger than the grand jury selection quotient by removing a significant number of cards from the drum. Although I made additional inquiries to Mrs. Turner on the subject, she refused to make further comment.
 
 
 [7]
 Brief in Response to Defendants' Motion to Dismiss, Vol. 21 at 1020 (footnote omitted)
 
 
 [8]
 Transcript Vol. 11 at 111-12
 
 
 [9]
 The Act provides:
 (a) The jury commission, or in the absence thereof the clerk, shall maintain a qualified jury wheel and shall place such wheel names of all persons drawn from the master jury wheel who are determined to be qualified as jurors and not exempt or excused pursuant to the district court plan. From time to time, the jury commission or the clerk shall publicly draw at random from the qualified jury wheel such number of names of persons as may be required for assignment to grand and petit jury panels. The jury commission or the clerk shall prepare a separate list of names of persons assigned to each grand and petit jury panel.
 28 U.S.C.A. § 1866(a) (emphasis supplied). See also 28 U.S.C.A. § 1864(a) (requirement of random selection of names from master wheel).
 
 
 [10]
 28 U.S.C.A. § 1866(a). "Publicly draw" is defined as
 ... a drawing which is conducted within the district after reasonable public notice and which is open to the public at large under the supervision of the clerk or jury commission, except that when a drawing is made by means of electronic data processing, "publicly draw" shall mean a drawing which is conducted at a data processing center located in or out of the district, after reasonable public notice given in the district for which juror names are being drawn, and which is open to the public at large under such supervision of the clerk or jury commission as the Judicial Conference of the United States shall by regulation require ....
 28 U.S.C.A. § 1869(k).
 
 
 [11]
 A person is "disqualified" from jury service if he
 (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
 (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
 (3) is unable to speak the English language;
 (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
 (5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.
 28 U.S.C.A. § 1865(b).
 The category of exempt persons includes:
 (i) members in active service in the Armed Forces of the United States;
 (ii) members of the fire or police departments of any State, district, territory, possession, or subdivision thereof;
 (iii) public officers in the executive, legislative, or judicial branches of the Government ....
 28 U.S.C.A. § 1863(b)(6); Local Plan 88. Although the Local Plan could have provided for the exemption of additional groups of persons upon a finding it would be in the public interest and not inconsistent with the Act, see 28 U.S.C.A. § 1863(b)(6), the Northern District elected to adopt only the exemptions provided in the Act.
 
 
 [12]
 Pursuant to 28 U.S.C.A. § 1863(b)(5), the Local Plan provides excusals for:
 (1) all ministers of the gospel and members of religious orders actively so engaged;
 (2) all actively practicing attorneys, physicians, dentists, and registered nurses;
 (3) any person who has served as a grand or petit juror in a federal court during the past two years immediately preceding his call to serve;
 (4) persons having active care and custody of a child or children under 10 years of age whose health and/or safety would be jeopardized by their absence for jury service;
 (5) a person who is essential to the care of aged or infirm persons; and
 (6) all persons over 70 years of age at time of executing the jury qualification form.
 Local Plan 88.
 
 
 [13]
 The district court opinion actually states 188 persons rather than 178 were improperly excused on this basis. 510 F.Supp. at 697. The context in which this figure appears as well as the evidence, however, indicates the 188 was a typographical error
 
 
 [14]
 The exact percentages are as follows:
 (1) Percentage of qualified jurors
 
 
 [495]
 / 30,230 = .01637, or approximately 1.64%
 (2) Percentage of screened questionnaires
 
 
 [495]
 / 42,105 = .01175, or approximately 1.18%
 
 
 [15]
 "Undue hardship or extreme inconvenience" is defined in the Act as
 ... great distance, either in miles or traveltime, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror; and in addition, in situations where it is anticipated that a trial or grand jury proceeding may require more than thirty days of service, the court may consider, as a further basis for temporary excuse, severe economic hardship to an employer which would result from the absence of a key employee during the period of such service ....
 28 U.S.C.A. § 1869(j).
 
 
 [16]
 See p. 607 supra