**UNITED STATES of America, Plaintiff,**

v.

**Terry Wayne GRISHAM, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Wealthy STUTSON, et al., Defendants.**

**Nos. CR–93–N–0170–S, CR–93–N–0152–S.**

United States District Court,
N.D. Alabama, S.D.

Jan. 10, 1994.

Pointer, Chief Judge, Hancock, Propst, Acker, and Blackburn, JJ., and Lynne, Guin, and Haltom, Senior District Judges, filed opinion specially concurring.

**1140**

Donald L. Colee, Jr., Birmingham, AL, for Terry Wayne Grisham.

George W. Andrews, III, White Dunn & Booker, Birmingham, AL, for Wealthy Stutson.

Tommy E. Tucker, Snable & Tucker, Birmingham, AL, for defendant James Bradley, Jr.

Susan Graham James, Montgomery, AL, Gail Dickinson–Shrum, Birmingham, AL, for Anthony Leo Stutson.

Sarah Fain Browne, Jo Alison Taylor, Birmingham, AL, for Lawanda Collins.

Joel F. Alexander, III, Doss & Alexander, Birmingham, AL, for Henry Eubanks.

James R. Gillis, Birmingham, AL, for Billy Ray Collins.

Steven L. Atha, Shores Lee Sparks & Atha, Birmingham, AL, for Laura Jean Harris.

Tamara Kaye Erskine, Birmingham, AL, for Raymond Crumpton.

Richard L. Izzi, Gespass & Izzi, Birmingham, AL, for Donnerell Warren.

Carl E. Chamblee, Jr., Chamblee & Associates, Birmingham, AL, for Tanya Stutson.

William K. DelGrosso, Birmingham, AL, for Efrem Stutson.

Rodger M. Smitherman, Birmingham, AL, for Carlton Williams.

Maria L. Reuther, Birmingham, AL, for Paul Hines.

Kenneth J. Gomany, Birmingham, AL, for Elese Johnson.

David R. Arendall, Birmingham, AL, for Gary Alan Warren.

Eugene R. Verin, Eugene R. Verin, P.C., Bessemer, AL, for Doretta Denice Standifer.

Caryl P. Privett, Michael Whisonant, Robert J. McLean, Claude Harris, James D. Ingram, Bill L. Barnett, U.S. Attys. Office, Robert S. Vance, Birmingham, AL, for U.S.

## MEMORANDUM OF OPINION

EDWIN L. NELSON, District Judge.

The court has for consideration motions of the defendants to dismiss the indictments in each of these cases, because of alleged irregularities in this district's method of selecting grand and petit juries. The parties have stipulated to the pertinent facts and have been allowed an opportunity to present additional evidentiary support for their motions. On motion of the United States and with the concurrence of counsel for the defendants,

the court has consolidated the motions for the hearing only. None of the matters presented at the consolidated hearing requires that any credibility choice be made or adds in any material way to the stipulated facts.[1] The court has previously entered orders denying the motions in all respects. This opinion is to accompany those orders.[2]

Defendant Terry Wayne Grisham (CR–93–N–0170–S) stands charged in a one-count indictment with a violation of 18 U.S.C.S. § 2113(a) (1991), robbery of a federally insured banking institution. The sixteen defendants in *United States v. Wealthy Stutson, et al.* (CR–93–N–0152–S) are charged in thirty-three counts with various violations of: 18 U.S.C.S. § 922(k) (1979), possession of a firearm with an altered serial number; 18 U.S.C.S. § 924(c), use of a firearm during and in relation to a drug trafficking crime; 18 U.S.C.S. § 1956(a)(1)(B)(i) (1991), structuring a financial transaction; 21 U.S.C.S. § 841(a)(1) (1984), possession of a controlled substance with intent to distribute; 21 U.S.C.S. § 846, conspiracy to possess a controlled substance with intent to distribute; 21 U.S.C.S. § 843(b), use of a communications facility in the commission of a drug trafficking crime; 21 U.S.C.S. § 848, conducting a continuing criminal enterprise; and 26 U.S.C.S. § 5861(d) (1988), possession of an unregistered firearm.

## I. The Facts.

All defendants in both cases are black persons, who have been charged with significant felony offenses, which are alleged to have been committed within the Southern Division of the Northern District of Alabama and elsewhere. The cases are assigned to the Southern Division and are scheduled for trial in that division.[3] The indictments were returned by grand juries and the trials are scheduled before petit juries drawn from the entire Northern District.

Two substantially identical jury selection plans are at issue in this matter. *See generally* 28 U.S.C.S. §§ 1861–1878 (1989), the Jury Selection and Service Act of 1968 (hereinafter referred to as the "Act"). The grand juries which returned the indictments at issue were drawn under a plan that was adopted by all the judges of the court on July 25, 1989, and approved by a reviewing panel of the judicial council of the United States Court of Appeals for the Eleventh Circuit on August 28, 1989. 28 U.S.C.S. § 1863. The petit juries before which these cases will be tried will be selected under a second plan adopted by the court on January 7, 1993, and

1. Dan E. Nix, the supervisor of the Clerk's Jury Section, testified and largely confirmed matters set forth in his declaration filed in the *Grisham* matter on October 25, 1993. The defendants also called Dr. Arthur Wilke, a professor of sociology at Auburn University. They proposed to examine Dr. Wilke regarding sociological factors at work in the black community that might account for the lower percentage of black persons being placed on the master and qualified jury wheels in this court and the perceived failure of summoned blacks to actually appear for jury service at the same rate as white persons. The court sustained the government's objection to the testimony of Dr. Wilke on relevancy grounds but allowed the defendants to make a proffer in question and answer form. The court reasoned that in the absence of a legally cognizable disparity between the jury eligible black population and the black representation in the jury venire, there was no occasion to examine the reasons for the small disparities that were shown.

2. Judge U.W. Clemon of this court, in a civil case, recently sustained a statutory challenge to the jury selection system used in the court before October 1, 1993. In *Hardin v. City of Gadsden,* 821 F.Supp. 1446 (N.D.Ala.1993), Judge Clemon ruled that the use of a district-wide system had the effect of excluding black persons from jury service on economic and sociological grounds. He did not reach any of the constitutional issues. In these cases, the court does reach the Fifth and Sixth Amendment claims and finds them meritless. On the statutory claims, the court addresses the systems in use both before and after October 1, 1993, and reaches conclusions different from those reached by Judge Clemon in a civil context regarding the prior system.

3. The Northern District of Alabama comprises seven statutory divisions: the Northwestern Division embraces Colbert, Franklin and Lauderdale counties; the Northeastern Division consists of Cullman, Jackson, Lawrence, Limestone, Madison and Morgan counties; the Southern Division has Blount, Jefferson and Shelby counties; the Eastern Division contains Calhoun, Clay, Cleburne and Talladega counties; the Western Division has the counties of Bibb, Greene, Pickens, Sumter and Tuscaloosa; the Middle Division comprises Cherokee, DeKalb, Etowah, Marshall and St. Clair counties; and the Jasper Division contains Fayette, Lamar, Marion, Walker and Winston counties. 28 U.S.C.S. § 81 (1988).

approved by the judicial council reviewing panel on March 18, 1993. This second plan became effective and has been used for the selection of grand and petit juries since October 1, 1993. The two plans (hereinafter referred to collectively as the "Plan") are, in all material respects, identical.[4]

Under the terms of the Plan, the Clerk of Court is authorized and directed to establish a "master jury wheel" for the district as a whole, comprised of the names of persons randomly selected from voter registration lists throughout the district.[5] Pursuant to the Plan and 28 U.S.C.S. § 1864(a), the Clerk periodically selects names at random from the master jury wheel and mails a juror questionnaire to those selected. Returned questionnaires are examined to determine which persons are qualified for jury service and are not exempt or subject to excuse. See 28 U.S.C.S. §§ 1863(b)(5), 1863(b)(6), 1865. The names of persons found to be qualified and neither exempt nor subject to excuse are then placed on the "qualified jury wheel." It is from this qualified wheel that the names of prospective jurors are randomly selected and summoned as the need arises for service on both grand and petit juries. 28 U.S.C.S. § 1866.

The Plan of March 1989 was in use until October 1, 1993, and all petit and grand juries which reported prior to that date were selected pursuant to it. Under that plan, the qualified jury wheel was filled twice; first by the "one-step method" authorized on an experimental basis by the Judicial Conference of the United States, and then, in 1990, by the "two-step process" provided by the Plan. The grand juries, which returned these indictments, were drawn from this latter "qualified wheel." Following the Plan, and utilizing a computerized data base maintained for the Clerk of the Court by the Trustee of the United States Bankruptcy Court for the Northern District of Alabama, 24,000 questionnaires were sent to persons randomly selected from the master wheel, with each county in the district being proportionately represented. There were returned 5,479 questionnaires as "undeliverable," and 3,135 elicited no responses. The Clerk made no further effort to contact any of those persons.[6] More than 5,000 persons were excused based upon grounds established by the Plan and by statute. See, 28 U.S.C.S. §§ 1863(b)(5), 1863(b)(6), 1865. Eventually, a qualified jury wheel composed of 9,188 persons was established: 7,614 white (83%); 1,460 black (15.9%); and 98 other (1.1%). The remainder of the court's discussion will focus on the jury plan that is currently in use.[7]

Following approval of the current plan by the circuit reviewing panel in March 1993, the Clerk placed approximately 37,000 names on the master jury wheel. Between June 7, 1993, and July 21, 1993, questionnaires were mailed to 8,076 persons randomly selected from the master jury wheel. The post office returned 1,123 questionnaires as undeliverable; another 1,175 were not returned; and 5,778 forms were completed and returned. A qualified wheel of 4,359 names was completed on August 25, 1993.

4. The court is aware, of course, that there is presently pending before a reviewing panel of the Eleventh Circuit a third plan which is identical to the others with the single exception of a provision which would permit the court to adjust the qualified jury wheel to more closely reflect the racial and gender composition of the Northern District of Alabama. That plan has not been implemented pending approval by the reviewing panel. It is not an issue here and may never be material to any aspect of these cases.

5. The Plan provides:
 The Court has determined that the official voter registration lists maintained by the counties comprising the district represent a fair cross section of the community and that inclusion of names from other sources is not necessary to foster the policies and protect the rights secured by 28 U.S.C.S. §§ 1861 and 1862.

6. Mr. Nix stated that no follow-up was done because (1) the cost to do so was great, (2) experience has taught that follow-up procedures generally yield few additional names and (3) the Clerk acquired sufficient names to fill the qualified wheel without such follow-up.

7. Except that the absolute disparities in the jury-eligible black persons in the community and on the master and qualified wheels are slightly different, the discussion here is equally applicable to both plans. In any event, the result is the same. The grand juries that returned these indictments were drawn under a system that comported with requirements of the law and the petit juries before which these cases will be tried will likewise be so drawn.

In the Northern District of Alabama, black citizens 18 years of age and older[8] comprise 18.31% of the population and 16.85% of the master jury wheel.[9] White citizens who are 18 years of age and older constitute 80.74% of the population and 82.76% of the master jury wheel. "All others" make up 0.95% of the population and 0.39% of the master jury wheel. Black persons represent 13.59% of the qualified wheel; white persons represent 85.76%; and all others represent 0.64%. On a divisional basis, the disparities between the black population and representation on the master jury wheel range from an overrepresentation of 1.19% in the Western Division (29.24% census to 30.43% on the wheel) to an underrepresentation of 4.70% in the Southern Division (28.98% census to 24.28% on the wheel). On the qualified wheel, the range is from –0.34% in the Western Division (28.24% census to 28.90% on the wheel) to –9.02% in the Southern Division (28.98% census to 19.96% on the wheel).[10] See footnote 23, *infra.*

A representative sampling of the jury venires summoned between October 1, 1992, and October 31, 1993, demonstrates that blacks constituted 14.24% of those summoned, 15.40% of the venires,[11] and 15.27% of those jurors who actually served.[12]

## II. Discussion.

Challenges to the jury selection process may be founded upon the fair-cross-section

8. Under the provisions of 28 U.S.C.S. § 1865(b)(1), no person is eligible to serve who is not at least eighteen years of age. The Plan, likewise, provides that a person "under eighteen years of age" is not qualified for jury service.

9. According to Mr. Nix, approximately 80% of the names listed on the voter registration lists include information on race and sex. The clerk has no other source for that information until the juror questionnaires are returned. The figures are extrapolated from the available data.

10. Mr. Nix testified that the process of sending questionnaires to and qualifying persons on the master jury wheel is an ongoing one. The figures here represent the product of the questionnaires sent during June and July 1993. He stated that the Clerk is presently engaged in sending approximately 8,000 more questionnaires which will be examined and, presumably, will result in additional persons being placed on the qualified jury wheel. The proportions of persons by race on the qualified wheel may vary as names are added.

requirement of the Sixth Amendment, *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the equal protection component of the Fifth Amendment, *Cunningham v. Zant,* 928 F.2d 1006 (11th Cir.1991), or a substantial failure to comply with the provisions of the Act. *United States v. Gregory,* 730 F.2d 692, 699 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *United States v. Bearden,* 659 F.2d 590 (5th Cir. Unit B Oct. 1981), *cert. denied,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). The defendants assert that the Plan runs afoul of the Act or constitutional provisions through (1) the use of a district-wide qualified jury wheel as opposed to individual division wheels; (2) the Clerk's failure to pursue those persons who do not return a completed juror questionnaire form; and (3) the use of voter registration lists as the exclusive source for names of prospective jurors. An examination of these contentions under legal precepts applicable to jury selection challenges under the Fifth and Sixth Amendments and the Act reveals that none is well taken.

## A. The District–Wide Jury Wheel.

Defendants claim they are entitled to a qualified jury wheel drawn from the South-

11. Summoned persons are those who were selected from the qualified jury wheel and directed to report for jury service. The venires consisted of all persons who were summoned for service except those who were excused prior to the report date. Persons who served included all those who appeared, were found to be qualified and not exempt and who were not excused on the report date. It does not mean that they actually served on a trial jury.

12. These figures were compiled by Dr. Edwin L. Bradley, at the request of the United States, based upon 10 jury panels randomly selected from a total of 49 panels called between October 1, 1992, and October 31, 1993. They show that 84.95% of those summoned were white, but 84.20% of those on venires were white. In contrast, 14.24% of those summoned were black and 15.40% of those serving on venires were black. This evidence contradicts any claim that black persons fail to appear for service or that they request to be excused from service at a higher rate than do white persons.

ern Division, the division in which the cases are to be tried, rather than a district-wide jury wheel. The crux of this contention is that the qualified wheel from which their juries are drawn should reflect the 28.98% jury-eligible black population of the Southern Division instead of the 18.31% jury-eligible black population of the Northern District. The court finds no support in the law for the claim to a jury drawn only from the Southern Division of the district.

### 1. The Sixth Amendment.

■ The Sixth Amendment guarantees to every criminal defendant the right to a trial "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." As construed by the Supreme Court, this includes a requirement that the jury be drawn from a fair cross section of the community. *Holland v. Illinois,* 493 U.S. 474, 480, 110 S.Ct. 803, 807, 107 L.Ed.2d 905, 916 (1990); *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 697–98, 42 L.Ed.2d 690, 698 (1975). The defendants claim the relevant community for Sixth Amendment purposes is the division in which the crime was committed, rather than the entire district. The claim is unquestionably foreclosed by applicable Sixth Amendment decisional law.[13]

In *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), the Supreme Court discussed the evolution of this portion of the Sixth Amendment. The court observed that the original version of the amendment, as proposed by then Congressman James Madison, included the common law right of trial by "a jury of the vicinage." *Williams,* 399 U.S. at 94, 90 S.Ct. at 1902. " '[V]icinage' meant neighborhood, and 'vicinage of the jury' meant jury of the neighborhood or, in medieval England, jury of the county." *Id.,* 399 U.S. at 93 n. 35, 90 S.Ct. at

1902 n. 35. In the final version of the amendment, the "vicinage" requirement "had been replaced by wording that reflected a compromise between broad and narrow definitions of that term, and that left Congress the power to determine the actual size of the 'vicinage' by its creation of judicial districts." *Williams,* 399 U.S. at 96, 90 S.Ct. at 1903.

The Eleventh Circuit had occasion to consider the vicinage requirement of the Sixth Amendment in *United States v. Louwsma,* 970 F.2d 797 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1383, 122 L.Ed.2d 759 (1993). Citing *Williams,* the *Louwsma* court recognized that the framers had rejected a strict "vicinage" requirement in favor of the reference to the "district" in which the crime was committed. *Louwsma,* 970 F.2d at 801. The court observed, "[i]t was apparently understood that the districts mentioned in the amendment would be defined by Congress in the Judiciary Act, which was pending while the amendments were being debated." *Id.; See also Davis v. Warden, Joliet Correctional Inst. at Stateville,* 867 F.2d 1003 (7th Cir.), *cert. denied,* 493 U.S. 920, 110 S.Ct. 285, 107 L.Ed.2d 264 (1989) (since definition of "community" is arbitrary, it should be left to legislation).

Therefore, this court's practice of drawing juries from the district-at-large is consistent with the accepted view of the purpose of the amendment. All that is required is a prior legislative definition of the perimeter of the "community." The area from which jurors are drawn under the Plan corresponds to the boundaries of this court's jurisdiction as defined by Congress, 28 U.S.C.S. § 81, with the scope of venue in a criminal case, Fed. R.Crim.P. 18, and with the area contemplated by the Jury Selection and Service Act of 1968. 28 U.S.C.S. §§ 1861,[14] 1869(e).[15]

The court recognizes that juries drawn from divisions are equally acceptable as

---

13. The Supreme Court approved the practice of drawing juries from the district-at-large in *Barrett v. United States,* 169 U.S. 218, 18 S.Ct. 327, 42 L.Ed. 723 (1898). The court presumes the defendants claim that intervening decisions of the Court have undermined the holding in *Barrett.* However, as discussed in this opinion, the cases do not support that conclusion.

14. Litigants in courts of the United States "shall have the right to grand and petit juries selected at random from a fair cross section of the community in the *district or division* wherein the court convenes."

15. For purposes of the Act, a "division" shall mean "one or more statutory divisions of a judicial district."

those drawn from entire districts. *See Ruthenberg v. United States*, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918). In decisions which are binding on this court, however, the former Fifth Circuit Court of Appeals foreclosed any claim that a defendant is entitled to trial within any particular division of the district. *United States v. James*, 528 F.2d 999 (5th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). The *James* Court said,

> The venue provision of the Sixth Amendment provides only for trial in the *district* where the crime shall have been committed. There is no reference to a division within a judicial district. Rule 18, F.R.Crim.P. (sic) says that unless it is otherwise provided by statute or a Rule of Criminal Procedure, the trial shall be held in the district where the offense was committed. Authority is given the court to fix the place of trial within the district with due regard for the defendant and his witnesses. The division of a federal judicial district is not a unit of venue in criminal cases.

*James*, 528 F.2d at 1021 (emphasis in original). Citing *Bostick v. United States*,[16] the *James* court said, "... the division has no constitutional significance; the vicinage is the district." *James*, 528 F.2d at 1021 n. 33. The Fifth Circuit had previously rejected a criminal defendant's claim to an indictment by a grand jury drawn from the specific division in which the offense was committed. *United States v. Grayson*, 416 F.2d 1073 (5th Cir.1969), *cert. denied*, 396 U.S. 1059, 90 S.Ct. 754, 24 L.Ed.2d 753 (1970). Thus, it is well established that defendants are not entitled to a jury drawn from any particular division within a district. *And see, e.g., United States v. Young*, 618 F.2d 1281 (8th Cir.), *cert. denied*, 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52 (1980); *United States v. Florence*, 456 F.2d 46 (4th Cir.1972).

The demographic disparity among the divisions in this district does not change the result. To the contrary, the practice of drawing juries from the district-at-large avoids any claim that venue was set within a particular division to control the racial mix of the jury. *Cf. Zicarelli v. Dietz*, 633 F.2d 312, 316–20 (3d Cir.1980), *cert. denied*, 449 U.S. 1083, 101 S.Ct. 868, 66 L.Ed.2d 807 (1981) (reviewing claim that venue was laid in area demographically dissimilar from the area where the crime occurred). There is no evidence to support the claim that black jurors either will not or cannot travel to outlying divisions due to lack of transportation or unfamiliarity with the community. *Cf. Humphrey v. United States*, 896 F.2d 1066 (7th Cir.), *cert. denied*, 498 U.S. 938, 111 S.Ct. 342, 112 L.Ed.2d 306 (1990) (rejecting similar claim where no evidence supported the allegation); *See* footnote 12, *supra*.

■ Neither does the right to a jury drawn from a "fair cross section" of the community lend support to the defendants' claim. As discussed above, the "community" for Sixth Amendment purposes is the judicial district as defined by Congress. *See Davis*, 867 F.2d at 1010. The Sixth Amendment does not guarantee the defendants a jury that accurately mirrors the community. *Taylor v. Louisiana*, 419 U.S. at 538, 95 S.Ct. at 701. "The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does)." *Holland v. Illinois*, 493 U.S. at 480, 110 S.Ct. at 807. Nothing in the Sixth Amendment jurisprudence supports defendants' claim that they are entitled to a defined "community" which favors the particular cognizable group to which they belong.

Accordingly, the defendants' claim that they are entitled to juries drawn from the Southern Division is without basis in the Sixth Amendment.

### 2. The Equal Protection Challenge.

■ Equal protection concepts do not guarantee that a defendant will be tried by a jury composed in whole or in part of persons of his own race. *Batson v. Kentucky*, 476 U.S. 79, 85–86, 106 S.Ct. 1712, 1717, 90

---

**16.** 400 F.2d 449, 452 (5th Cir.1968), *cert. denied*, 393 U.S. 1068, 89 S.Ct. 725, 21 L.Ed.2d 712 (1969).

L.Ed.2d 69, 80 (1986). Rather, the defendants are entitled to be tried by a jury whose members have been selected pursuant to non-discriminatory criteria. *Id.* The clause guarantees the defendant that the State will not exclude members of his race from the jury on account of race, or on the false assumption that members of his race are not qualified to serve as jurors. *Id.*

■ There is no evidence to support any claim that black persons have been systematically excluded from jury service by the practice of drawing district-at-large juries. A challenge under the equal protection component of the Fifth Amendment requires that a defendant show:

> (1) he or she is a member of a group capable of being singled out for discriminatory treatment, (2) members of this group were substantially under-represented on the venire, and (3) the venire was selected under a practice providing an opportunity for discrimination.

*Cunningham v. Zant,* 928 F.2d 1006, 1013 (11th Cir.1991), *citing Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498, 510 (1977).

> The test does not eliminate the need to show discriminatory intent, but merely acknowledges that "[i]f a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process."

*United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1122 (Former 5th Cir. March), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981), *citing Castaneda,* 430 U.S. at 494 n. 13, 97 S.Ct. at 1280 n. 13.

None of the evidence before the court shows that the practice of drawing juries from the district-at-large provides an opportunity for discrimination. While it is true that the qualified wheel drawn from the district-at-large averages 13.59% black while some divisions within the district are as much as 28.98% black, in the circumstances of this case the disparity does not create a presumption of intent to discriminate. First, as discussed above, the Sixth Amendment does not entitle the defendants to a jury drawn from any particular division in this district. Neither do equal protection concerns entitle them to a jury composed in whole or in part of persons of their own race.

The significance of any disparity, then, is that it would tend to show an intent to discriminate. However, that intent cannot be inferred merely from defendants showing a disparity between the percentage of black jurors on the qualified wheel and the percentage of black persons eligible for jury service in a *hypothetical* community. There almost always will be a disparity between the percentage of black jurors on the wheel and the percentage of jury-eligible black persons in the population of any "community" which is not the community from which the wheel was drawn. That is not, and cannot be, the test of an equal protection question. Since the defendants are not entitled to trial in a self-defined community, which includes only the division in which the crime occurred, they are not entitled to compare their venire with that community for equal protection purposes.

### 3. The Jury Selection and Service Act of 1968.

The Act prescribes a general procedural scheme to be followed by the district courts in designing a jury plan. It "seeks to ensure that potential grand and petit jurors are selected at random from a representative cross section of the community, and that all qualified citizens have the opportunity to be considered for service." *United States v. Bearden,* 659 F.2d at 593; 28 U.S.C.S. § 1861 (1989). The Act prohibits discrimination on the basis of race, color, religion, sex, national origin, or economic status. *Id.;* 28 U.S.C.S. § 1862.

### a. Timeliness of the Motion.

■ The procedure established by the Act to challenge compliance with it is exclusive. *Bearden,* 659 F.2d at 595; 28 U.S.C.S. § 1867(e). "A motion to dismiss must be filed together with a sworn statement 'before the voir dire examination begins, or within seven days after the defendant discovered or

could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier.'" *Id.* This rigid time limitation was established to "prevent dilatoriness and to ensure the rapid disposition of claims, particularly those that are spurious." *Id.* The failure to comply "precisely" with those limitations forecloses a challenge to a jury selection system based upon alleged failures to comply with the Act. *Id., citing United States v. Hawkins,* 566 F.2d 1006 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978); *United States v. Kennedy,* 548 F.2d 608 (5th Cir.), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977); *United States v. De Alba–Conrado,* 481 F.2d 1266 (5th Cir.1973). A motion to dismiss by a criminal defendant based on alleged violations of the Act must be filed "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of due diligence, the grounds therefor, whichever is earlier." 28 U.S.C.S. § 1867(a) (1989). One who fails to comply precisely with the timeliness requirement of the Act is foreclosed from complaining and it is unlikely that the court has the authority to excuse strict compliance on equitable grounds. *Bearden,* 659 F.2d at 599 ("[W]e doubt that under the statute the district court has the authority to excuse strict compliance with the time requirements of the Act on equitable grounds...."). Furthermore, the motion must be accompanied by a sworn statement of facts that, if true, demonstrate a substantial failure to comply with the Act. 28 U.S.C.S. § 1867(d); *United States v. Kennedy,* 548 F.2d at 613.

■ As noted in the order of October 6, 1993, defendant Grisham's statutory challenge to the jury selection system came too late. The Grisham case was set for trial on October 5, 1993, and the jury selection process was begun on that date. At the completion of the voir dire, but before the jury was selected or seated, counsel for defendant Grisham orally objected to the racial composition of the jury panel and moved to dismiss the panel. The court, by order entered the following day, purported to excuse the untimeliness of the defendant's motion and to allow him until October 15, 1993, to "formalize" his challenge to comply with the provi-

sions of 28 U.S.C.S. § 1867(c). After an extension of that time, the formal motion was filed on October 18, 1993. Plainly, Mr. Grisham has not complied with the timeliness requirements of the Act. The court erred when it purported to allow him additional time to make his statutory challenge. His motion, to the extent it addresses any alleged failure to comply with the requirements of the Act, has been denied as untimely, by separate order.

The motions filed by the *Stutson* defendants were timely and will be addressed on the merits.

**b. The Merits.**

■ The Act "provides for dismissal of an indictment only when there has been a *substantial* failure to comply with the statutory provisions in selecting the grand or petit jury." *Bearden,* 659 F.2d at 600 (emphasis in original). In order to prevail on a claim of substantial failure to comply with the Act, the defendants must demonstrate that two important principles have been frustrated: "(1) random selection of juror names and (2) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions." *United States v. Gregory,* 730 F.2d at 699. "'These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.'" *Bearden,* 659 F.2d at 600–01, citing H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1793. A substantial violation of the Act will be found only when these principles are frustrated. *Id.* Mere "technical" deviations from the Act, or even a number of them are insufficient. *Id.*

■ The Act provides that juries are to be "selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C.S. § 1861. It further provides that "[s]eparate plans may be adopted for each division or combination of divisions within a judicial district." 28 U.S.C.S. § 1863(a). The Act specifically sanctions the practice of

selecting jurors from the district-at-large, and nothing in it requires that juries be drawn by divisions. The use of a district-wide jury wheel does not affect the randomness of the selection or raise the possibility that persons will be excluded from juries for subjective reasons.

Furthermore, the practice of drawing juries from the entire district is not irrational. It ensures that the boundaries of the "community" from which the jury is drawn are coterminous with the jurisdiction of the court. 28 U.S.C.S. § 81. Venue in a criminal case is proper anywhere within the district. Fed.R.Crim.P. 18. Drawing jurors from the entire district nullifies any possibility that venue for trial will be manipulated to control the racial mix of the jury.[17] Under a division wheel system, a black defendant charged with committing an offense in the Southern Division (28.98% black), giving "due regard to the convenience of the defendant and the witnesses and the prompt administration of justice," could be tried in the Jasper division with a jury drawn solely from that division (5.55% black).[18]

A similar situation would exist in civil matters. After the repeal of the former 28 U.S.C.S. § 1393, effectively eliminating division venue in civil cases, the plaintiff in a civil case may elect to file a complaint in any of the court's statutory divisions. A division-based jury selection system would allow a plaintiff, subject to a change of the trial location pursuant to 28 U.S.C.S. § 1404 or § 1406, to influence the racial mix of the jury venire by the simple expedient of selecting the division in which to file the action. A district-wide jury selection system avoids the possibility that any case, criminal or civil, will be set for trial in a particular division in order to influence the racial mix of the jury venire.

Where there is no objection, criminal cases in this district are routinely set for trial in Birmingham, regardless of the division to which the case is assigned. *See, e.g., United States v. Burns,* 662 F.2d at 1382–83 (noting the procedure is used to aid the court in providing for speedy trials of criminal cases). Under this practice all criminal cases in the district, subject to a motion for a trial setting in an outlying division, are set for trial in the Southern Division at Birmingham.[19] This is so even though the available evidence suggests that in only about one-half of the indicted cases is it alleged that the offense occurred in the Southern Division.[20] The use of a district-wide qualified wheel thus fosters another important policy of the Act; it ensures that jury-eligible persons who live in the Northern District but outside the Southern Division will have an opportunity to be considered for jury service equal to that enjoyed by persons who live in the Southern Division. 28 U.S.C.S. § 1861.

The Act authorizes selection of juries from the district or division wherein the court convenes. The Plan clearly sets out which choice the judges of this court have made. The defendants have not established that the use of a district-wide qualified jury wheel adversely impacts on the random selection of juror names or that disqualifications, excuses, exemptions, and exclusions are determined on other than an objective basis.

### 4. Summary of Division/District Discussion.

The practice of drawing jurors from the district-at-large falls within the ambit of the Sixth Amendment requirement of an impartial jury from the *district* in which the crime was committed. As interpreted by the Supreme Court, the Sixth Amendment permits juries drawn from districts or divisions within a district, as established by act of Congress. The practice does not frustrate the

---

17. The fixing of a place of trial within a district is within the discretion of the trial judge, giving due regard to the convenience of the defendant and the witnesses and the prompt administration of justice. *United States v. Burns,* 662 F.2d 1378, 1382 (11th Cir.1981).

18. See Fed.R.Crim.P. 18 and *United States v. Burns,* 662 F.2d at 1382–83.

19. See Fed.R.Crim.P. 18.

20. The evidence is sparse but consistent with the text. As of December 1, 1993, there were 110 criminal cases pending in the district. Of those, 50.91% (56) were assigned to the Southern Division. There were 166 defendants in these criminal cases. Southern Division defendants represented 48.19% (80) of the total.

defendants' right to a jury drawn from a fair cross section of the community. Defendants' equal protection right to a jury from which members of their race have not been systematically excluded does not permit them to redraw the lines of the "community" to fit their own special interests. Finally, the Jury Selection and Service Act of 1968 expressly sanctions the practice of drawing juries from the district-at-large, and the defendants have not shown that the practice frustrates the statutory goals of random jury selection and objectivity. After careful review of the applicable law and the relevant evidence, the court is satisfied that the practice of using a district-wide qualified jury wheel wholly conforms to both the letter and spirit of the law, statutory and constitutional.

## B. The Remaining Claims.

 The defendants also claim the use of voter registration lists as the sole source of names for the master jury wheel[21] and the Clerk's failure to follow up with those persons who do not return questionnaires[22] adversely affect their rights under the Sixth Amendment, the Fifth Amendment equal protection component, and the Act.

As discussed above, the defendants would compare the 28.98% black population in the Southern Division with the 13.59% of black jurors on the qualified wheel drawn from the district-at-large. However, when the 13.59% of black jurors on the qualified wheel is compared with the percentage of eligible black persons in the *relevant* community, *i.e.*, the entire district (18.31%), the disparity is not sufficiently large to support a challenge under the Fifth or Sixth Amendments or the Act.[23]

In order to establish a prima facie case of a violation of the Sixth Amendment fair-

21. The use of voter registration lists is specifically authorized by the Act. 28 U.S.C.S. § 1863(b)(2). Resort to other sources of names is required only where necessary to foster the policies and protect the rights secured by the Act. *Id.* The defendants offered scant evidence on this point, limiting themselves to a brief examination of Mr. Nix regarding whether sources other than voter registration lists were used. There was no evidence to support a conclusion that the use of other sources, such as driver license lists, would better serve the aims of the Act or Fifth and Sixth Amendment concerns. The court is not required to supplement the voter registration lists in the absence of a showing that the exclusive use of such lists substantially impacts on the composition of the average jury or that it results in the systematic exclusion of a cognizable group from jury service. *United States v. Maskeny*, 609 F.2d 183, 193 (11th Cir.1980).

22. The Act provides that juror qualification forms "shall" be mailed to those persons randomly selected from the master jury wheel. 28 U.S.C.S. § 1864(a). Any person who fails to return a completed juror qualification form "may" be summoned to appear and complete a

form. *Id.* The Act does not require the Clerk to exercise his power to summon such persons to personally appear before him. *Id., See United States v. Gometz*, 730 F.2d 475, 480 (7th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984). Though his testimony was excluded on relevancy grounds, Dr. Wilke did suggest two factors, a higher rate of illiteracy among black persons and a sociologically induced mistrust of government, that may account for the fact that black persons apparently return the juror questionnaire form at a lower rate than do white persons. He was unable to allocate responsibility for the lower return rate, as between those two factors. The court notes, however, that persons lacking sufficient proficiency in the English language to complete the questionnaire are not eligible for jury service. 18 U.S.C.S. § 1865(b)(2). At least to the degree that a greater rate of illiteracy among blacks accounts for a lower questionnaire return rate, it is a factor recognized in the law as being acceptable.

23. The parties have agreed that the percentages of jury-eligible blacks and their representations on the master and qualified jury wheels in the various divisions and the district are as follows:

| Division | Census % | Master Wheel % | Master Wheel Difference | Qualified Wheel % | Qualified Wheel Difference |
|---|---|---|---|---|---|
| Eastern | 19.56 | 16.91 | −2.65 | 14.74 | −4.82 |
| Jasper | 5.55 | 6.64 | 1.09 | 3.85 | −1.70 |
| Middle | 6.55 | 6.37 | −0.18 | 4.58 | −1.97 |
| Northeast | 12.41 | 11.10 | −1.31 | 7.35 | −5.06 |
| Northwest | 9.92 | 9.48 | −0.44 | 9.38 | −0.54 |
| Southern | 28.98 | 24.28 | −4.70 | 19.96 | −9.02 |
| Western | 29.24 | 30.43 | 1.19 | 28.90 | −0.34 |
| District | 18.31 | 16.85 | −1.46 | 13.59 | −4.72 |

cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process.

*Duren,* 439 U.S. at 364, 99 S.Ct. at 668. Failure on any element of the prima facie case ends a challenge under the Sixth Amendment. *United States v. Pepe,* 747 F.2d 632, 649 (11th Cir.1984). To establish the second element, the defendant must show an "absolute disparity" of 10% between the proportion of black persons among all the persons eligible for jury service in the district and the percentage of black persons on the qualified wheel. *United States v. Rodriguez,* 776 F.2d 1509, 1511 (11th Cir.1985); *Foster v. Sparks,* 506 F.2d 805, 834–35 (5th Cir.1975).

The test for a Sixth Amendment fair-cross-section violation applies in determining a violation of the Act's fair-cross-section requirement. *Pepe,* 747 F.2d at 648 n. 17, *citing, United States v. Perez–Hernandez,* 672 F.2d 1380 (11th Cir.1982). The defendants must establish an absolute disparity of 10% between the relevant population and the percentage of black jurors on the qualified wheel to sustain their claim under the Act. *Id.* at 648–49.

The prima facie case under equal protection concepts is "virtually identical" to the Sixth Amendment prima facie case. *United States v. Tuttle,* 729 F.2d 1325, 1327 n. 2 (11th Cir.1984), *cert. denied,* 469 U.S. 1192, 105 S.Ct. 968, 83 L.Ed.2d 972 (1985).[24] As in Sixth Amendment cases, prima facie proof of an equal protection violation in the jury selection process requires evidence of an absolute disparity of greater than 10% between the eligible population in the community and the percentage represented on the qualified wheel. *Barksdale,* 639 F.2d at 1122; *Tuttle,*

729 F.2d at 1327–28 n. 4; *See Gibson v. Zant,* 705 F.2d 1543 (11th Cir.1983) (noting that prima facie tests are almost identical in judging disparity for equal protection and fair-cross-section claims.) "A party claiming disproportionate representation of a particular group in a jury selection process must show a substantial disparity between that group's representation in the selection process and its representation in the general population." *United States v. Gregory,* 730 F.2d 692, 699 (11th Cir.1984); *See Tuttle,* 729 F.2d at 1327 (The Eleventh Circuit has consistently required an absolute disparity of more than 10% between the proportion of the underrepresented group in the general population and its representation on the venire.) Here, the data reveals that 18.31% of the eligible population in the district is black. The master wheel includes 16.85% black persons and the qualified wheel includes 13.59% black persons. Since the use of voter registration lists affects only the representation of black persons on the master jury wheel, the relevant disparity is the 1.46% disparity between the representation of black persons on the master wheel and the general population of the district. The failure to pursue those who did not return questionnaires affected the percentage of black persons who were moved from the master wheel to the qualified wheel. The relevant disparity then is the difference between the percentage of black persons on the master wheel and the percentage of black persons on the qualified wheel. That disparity is 3.26%. The maximum disparity, whatever its cause, is the 4.72% disparity in representation of eligible black persons in the general population of the district as a whole and the representation on the qualified jury wheel drawn from the district. None of these absolute disparities is of sufficient magnitude to establish a prima facie case under the fair-cross-section requirement of the Sixth Amendment, the equal protection component of the Fifth Amendment, or the Act.

### III. Conclusion.

For these reasons the Court finds the Jury Selection Plan in the Northern District of

---

**24.** Discriminatory intent, however, is immaterial to a Sixth Amendment claim. *United States v.* *Tuttle,* 729 F.2d at 1327–28 n. 4.

Alabama conforms to the requirements of the Sixth Amendment, the equal-protection requirements of the Fifth Amendment and the requirements of the Jury Selection and Service Act of 1968. None of the defendants' challenges are well taken. For the reasons stated, the motions properly were denied in their entirety.

## Special Concurrences

Having reviewed the foregoing opinion and noting that, in view of the lack of any substantial controversy regarding the factual matters on which the decision is based, the issues involve only questions of law, the undersigned hereby acknowledge their concurrence in the following conclusions contained in that opinion:

(1) that the Jury Plans adopted by this court on July 25, 1989 (as approved by the Judicial Council of the Eleventh Judicial Circuit on August 28, 1989) and on January 7, 1993 (as approved by the Judicial Council for the Eleventh Judicial Circuit on March 18, 1993) conform to the requirements of the Fifth and Sixth Amendments to the Constitution of the United States and to the Jury Selection and Service Act of 1968, 28 U.S.C.S. §§ 1861–1878, with respect to the selection of grand juries and petit juries for criminal cases in this district;

(2) that the use of a district-wide master and qualified jury wheel (as contrasted with divisional-wide master and qualified jury wheels) in the selection of grand juries and petit juries for criminal cases in this district satisfies the requirements of the Fifth and Sixth Amendments to the Constitution of the United States and the Jury Selection and Service Act of 1968, 28 U.S.C.S. §§ 1861–1878; and

(3) that the official voter registration lists maintained by the thirty-one counties that comprise this district represent a fair cross section of the community with respect to the selection of grand juries and petit juries for criminal cases in this district, and that inclusion of names from other sources is not currently required by the Fifth or Sixth Amendments to the Constitution of the United States or by the Jury Selection and Service Act of 1968, 28 U.S.C.S. §§ 1861–1878.

/s/Sam C. Pointer, Jr.

Sam C. Pointer, Jr., Chief Judge

/s/Robert B. Propst, Jr.

Robert B. Propst, Judge

/s/Sharon Lovelace Blackburn

Sharon Lovelace Blackburn, Judge

/s/J. Foy Guin, Jr.

J. Foy Guin, Jr., Senior Judge

/s/James H. Hancock

James H. Hancock, Judge

/s/William M. Acker, Jr.

William M. Acker, Jr., Judge

/s/Seybourn H. Lynne

Seybourn H. Lynne, Senior Judge

/s/E.B. Haltom, Jr.

E.B. Haltom, Jr., Senior Judge